**UNITED STATES of America,**
**Plaintiff,**

v.

**ALISAL WATER CORPORATION,**
**et al., Defendants.**

**No. C–97–20099–JF (EAI).**

United States District Court,
N.D. California,
San Jose Division.

Sept. 15, 2000.

---

Karen Dworkin, Lori Jonas, U.S. Department of Justice, Washington, DC, for plaintiff.

Stephan Barber, Ropers, Majeski, Kohn & Bentley, San Jose, CA, for defendants.

## ORDER [1] GRANTING PLAINTIFF'S MOTIONS FOR PARTIAL · SUMMARY JUDGMENT

FOGEL, District Judge.

On October 12, 1999, the Court heard argument regarding three motions for partial summary judgment brought by Plaintiff. All three motions will be granted for the reasons set forth below.

### I. BACKGROUND

In this civil action Plaintiff asserts that Defendant public water systems have committed numerous violations of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f *et seq.*, and the regulations implemented thereunder. Defendant Alisal Water Corporation owns and operates eight public water systems in the Salinas, California area: Alco Water Service, Blackie

[1]. The original version of this order was issued on August 23, 2000, at which time it was labeled "Not For Publication." The instant order is identical to the original order except that the instant order is designated for publication and corrects typographical errors contained in the original order.

Road Water System # 18, Pine Canyon Division of Alco Water Service, Wildwood Water System, San Jerardo Water System, Vierra Canyon Water System, Vierra Estates Water System, and Langley/Valle Pacifico Water System. Defendant Toro Water Service owns and operates a public water system of the same name in the Salinas area. Defendant Moss Landing Harbor District, a subsidiary of Alisal Water Corporation, owns and operates the Moss Landing public water system. Defendant North Monterey County Water Service, Inc. ("NORMCO"), a subsidiary of Alisal Water Corporation, operates NORMCO public water system. All of these corporations and public water systems are owned, operated or controlled by two individuals, Robert Adcock and his wife Natholyn Adcock, both of whom are named as defendants in this action. Plaintiff seeks prospective injunctive relief, an assessment of substantial civil penalties and recovery of costs.

*Overview Of The SDWA*

The SDWA requires that the Administrator of the United States Environmental Protection Agency ("EPA") promulgate national primary drinking water regulations addressing contaminants in drinking water provided through public water systems. The Administrator may grant to a state primary enforcement responsibility over public water systems so long as the state adopts and enforces drinking water regulations which are at least as stringent as the national primary drinking water regulations promulgated by the Administrator. The Administrator may bring a civil action for violation of any applicable requirement of the SDWA if requested by the state agency which has jurisdiction over compliance with national primary drinking water regulations or state drinking water regulations.

One set of regulations promulgated under the SDWA addresses levels of total coliform, an indicator of disease-causing organisms. These regulations, commonly known as the "Total Coliform Rule" or "TCR," set forth requirements for the maximum contaminant level ("MCL"), sampling, monitoring, reporting and record keeping.

Another set of regulations promulgated under the SDWA addresses levels of lead and copper. These regulations, commonly known as the Lead and Copper Rule, set maximum contaminant level goals ("MCLGs") for lead and copper and requirements for monitoring and evaluation of lead and copper levels.

In California, the State Department of Health Services ("DHS") is the agency with primary enforcement responsibility with respect to public water systems. The DHS in turn has agreements with local primary agencies ("LPAs") under which the LPAs enforce the SDWA as to certain public water systems. One such LPA, the Monterey County Health Department ("MCHD"), has primary enforcement responsibility with respect to some of the water systems at issue in this action while the DHS retains primary enforcement responsibility with respect to others.

*Investigation Of Defendants*

In December 1992 and thereafter, the DHS noticed discrepancies in reports submitted by some of the public water systems operated by Defendants. The DHS investigated, and concluded that the systems were not complying with testing requirements and in some cases were altering documents relating to test results for total coliforms. During the course of its investigation, the DHS concluded that some of the documents had been altered by the laboratory which performed the systems' testing, American Analytical Laboratories ("the Lab"). The Lab was owned by Robert Adcock and managed by his daughter Lynette. The DHS concluded that there was a conflict of interest because the Adcocks' water systems had too much control over the manner in which their samples were handled and reported. The DHS ultimately issued an order mandating that all water quality control analysis for all systems owned by the Adcocks

be performed by an independent laboratory.

In June 1994, the DHS requested that the EPA investigate the public water systems owned and operated by the Adcocks. On October 3, 1994, Magistrate Judge Patricia Trumbull granted the EPA's application for warrants to search the offices of Alco, Toro and the Lab. The warrants were executed on October 4, 1994, at which time a number of documents were seized. The seized documents were Bates-stamped by Special Agent Elizabeth Domagalski of the EPA, who also prepared an index showing which documents were found in which location. Additional documents subsequently were subpoenaed by a grand jury.

Review of the seized documents demonstrated inconsistencies. For example, worksheets and reports found at the Lab indicated positive test results for total coliform as to certain samples. However, reports found in the water systems' files indicated negative test results for the very same samples. Moreover, the seized documents indicated that the water systems commonly took many more samples than required and selected only negative samples for submission to the DHS or MCHD.

On August 15, 1996, the DHS sent a letter to the EPA requesting that the EPA bring civil and/or criminal action for violation of the SDWA against the Adcocks and all public water systems associated with them. Plaintiff filed this action on January 30, 1997. The operative second amended complaint asserts causes of action for: (1) failure of M.C.L. § for microbiological contaminants; (2) failure to notify state or county of failure of MCL; (3) failure to give public notice of failure of MCL; (4) failure to do repeat and increased routine monitoring; (5) failure to notify state or county of failure to do repeat or increased routine monitoring; (6) failure to report test results; (7) failure to sample according to written site sample plan; (8) failure to keep records; (9) failure to monitor for lead and copper; and (10) fraudulent conveyance.

*Motions For Partial Summary Judgment*

Plaintiff has filed three separate motions for partial summary judgment. The first motion seeks adjudication of the corporate defendants' liability with respect to the first eight causes of action. The second motion seeks adjudication of the corporate defendants' liability with respect to the ninth cause of action. The third motion seeks adjudication that Robert and Patricia Adcock are personally liable for the violations of the SDWA set forth in the first nine causes of action. Defendants oppose all three motions.

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion, and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the moving party meets its initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *See Anderson,* 477 U.S. 242, 248–49, 106 S.Ct. 2505; *Barlow v. Ground,* 943 F.2d 1132, 1134–36 (9th Cir.1991).

## III. DISCUSSION

### A. Motion Re First Eight Causes Of Action (Microbiological Contaminants)

The first eight causes of action allege that Defendant water systems violated national primary drinking water regulations regarding microbiological contaminants. Plaintiff seeks partial summary judgment with respect to these asserted violations.[2] The Court concludes that Plaintiff has submitted ample evidence of the asserted violations. This evidence includes numerous documents obtained from the Lab, the files of Defendant water systems and the files of the DHS and the MCHD. Examination of the documents reveals significant discrepancies between the test results documented by the Lab on the one hand and the test results recorded and reported by Defendants on the other hand. The documents also indicate that Defendant water systems knew they had microbiological contaminant levels exceeding the MCL, failed to report or give the public notice of such contaminant levels, failed to do repeat and increased routine monitoring as required, failed to report the lack of such repeat and increased routine monitoring, failed accurately to report test results, failed to sample in the manner required and failed to keep records in the manner required.

Defendants do not dispute the existence of the discrepancies documented by Plaintiff. Rather, Defendants contend that: (1) Plaintiff lacks standing to bring this action; (2) much of the documentary evidence submitted by Plaintiff is inadmissible; (3) most of the alleged violations are based upon an incorrect assumption that the positive coliform samples were routine samples; (4) Defendants collected water samples in conformance with a site sampling plan as required by applicable regulations; (5) Plaintiff is estopped from asserting the violations; and (6) Plaintiff is selectively enforcing the law. All of these arguments are without merit.

### (1) Standing

■ Defendants contend that the United States lacks standing to bring this lawsuit. However, standing is conferred pursuant to 42 U.S.C. § 300g–3(b), which reads in its entirety as follows:

(b) Judicial determination in appropriate Federal district courts; civil penalties; separate violations

**The Administrator may bring a civil action in the appropriate United States district court** to require compliance with any applicable requirement, with an order issued under subsection (g) of this section, or with any schedule or other requirement imposed pursuant to a variance or exemption granted under section 300g–4 or 300g–5 of this title if—

(1) authorized under paragraph (1) or (2) of subsection (a) of this section, **or**

(2) **if requested by** (A) the chief executive officer of the State in which is located the public water system which is not in compliance with such regulation or requirement, or (B) **the agency of such State which has jurisdiction over compliance by public water systems in the State with national primary drinking**

---

**2.** These asserted violations involve ten different regulations enacted under the SDWA: 40 C.F.R. § 141.21(a), requiring that total coliform samples be taken pursuant to a written sample site plan; § 141.21(b)(1), requiring repeat sampling in the event that a routine sample tests positive for coliform; § 141.21(b)(5), setting requirements for routine sampling; § 141.21(g)(1), imposing reporting requirements upon public water systems which exceeds the M.C.L. § total coliform; § 141.21(g)(2), requiring a public water system to report monitoring violations; § 141.31(a), setting reporting requirements; § 141.32(a), imposing notification requirements upon owners and operators of public water systems which fail comply with an applicable M.C.L. § or other requirement; § 141.32(b), imposing notification requirements upon owners and operators of public water systems which fail to perform required monitoring; § 141.33(a), imposing record-keeping requirements upon owners and operators of public water systems; and § 141.63, setting MCLs for microbiological contaminants.

water regulations or State drinking water regulations.

The court may enter, in an action brought under this subsection, such judgment as protection of public health may require, taking into consideration the time necessary to comply and the availability of alternative water supplies; and, if the court determines that there has been a violation of the regulation or schedule or other requirement with respect to which the action was brought, the court may, taking into account the seriousness of the violation, the population at risk, and other appropriate factors, impose on the violator a civil penalty of not to exceed $25,000 for each day in which such violation occurs.

42 U.S.C. § 300g–3(b) (emphasis added). In the present case, the appropriate agency (the DHS) sent a letter to the EPA dated August 15, 1996, formally requesting that the EPA file civil and/or criminal suit against the Adcocks and their water systems for violation of the SDWA. (August 15, 1996 Letter of David Spath) Accordingly, the United States has standing to bring this action pursuant to subsection (b)(2).

Defendants contend that the Spath letter of August 15 was not sufficiently specific to confer standing on the United States. According to Defendants, a request from a state agency to the EPA must detail the specific regulations violated. No such requirement appears in the SDWA itself. Nor has the Court been able to discover any case law imposing such a requirement. In the absence of any authority to the contrary, the Court concludes that the plain statutory language means just what it says—the EPA may bring action if requested by the appropriate state agency. The EPA was so requested.

Defendants also contend that the EPA lacks standing unless it can show that the requirements of both subsection (b)(1) *and* subsection (b)(2) were met. Subsection (b)(1) refers to statutory language providing for notice to water systems of violations and offers of advice and technical assistance to bring such water systems into compliance. Defendants contend that because the requisite notice of violations and offers of assistance were not given, the EPA lacks standing to pursue this suit. Defendants are mistaken. The statute clearly confers standing upon the EPA provided that the requirements of subsection (b)(1) *or* subsection (b)(2) are met. The requirements of subsection (b)(2) were met, as discussed above.

## (2) Admissibility Of Evidence

Defendants object to the admission of documents seized at the Lab. Those documents are authenticated through the declaration of Elizabeth Domagalski, the EPA agent in charge of the search. Ms. Domagalski Bates-stamped the documents and kept the chain of custody. Defendants concede that Ms. Domagalski is competent to testify that the documents submitted are the documents seized at the Lab, but contend that the documents are inadmissible under the hearsay rule.

■ The Court concludes that the documents are admissible. Defendants authorized the Lab to test samples and send results directly to appropriate government agencies. Accordingly, the documents appear to constitute admissions of an agent under Federal Rule of Evidence 801(d)(2)(C) and (D).

■ Additionally, the documents are admissible as business records under Federal Rule of Evidence 803(6). There can be no real dispute that the documents were kept in the ordinary course of the Lab's business. Defendants argue that the documents are inadmissible because they are "untrustworthy." Under Rule 803(6), the business records exception to the hearsay rule does not apply if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed.R.Evid. 803(6). Defendants introduce statements from Lab employees indicating that mistakes often were made on reports. If this happened, the employ-

ee would re-do the report and place the first, erroneous version of the report in a recycle bin. Defendants' theory is that a number of the documents seized from the Lab were these first version reports. However, Plaintiff introduces evidence that the alleged violations occurred eight months to three years prior to the date upon which the Lab documents were seized. There is no evidence that discarded reports stayed in the recycle bins for that length of time. Finally, there is no evidence that Lab worksheets, upon which the final reports were based, ever were re-done in the same manner as the reports. The Lab worksheets provide the information necessary to prove the alleged violations.

### (3) Positive Coliform Samples

Defendants contend that a number Plaintiff's claims are based upon an assumption that the samples in question were routine samples. Defendants contend that Plaintiff has not proved this assumption and that triable issues of material fact exist as to whether the samples in question were routine samples.

Plaintiff contends that there *is* evidence that the samples in question were routine samples. Octavio Castillo, a sampler for Alisal, testified that when a sample was special rather than routine the sample was so labeled. Additionally, the 30(b)(6) deponent for the Lab testified that when a sample was special that information was indicated on the final report. Not one of the samples referenced by Plaintiff is labeled "special."

Plaintiff further argues that to the extent any uncertainty exists regarding the purpose of particular samples, this uncertainty was caused by Defendants' failure to keep records in the manner required by applicable regulations. Plaintiff contends that Defendants should not be permitted to use its own sloppy record-keeping practices to shield itself from liability for fail-

ing to report positive samples and failing to do repeat testing.

■ The Court concludes that Plaintiff's showing is sufficient to meet its burden of demonstrating that the samples in question were routine and that Defendants have failed to create a triable issue as to this material fact. Defendants point to the testimony of Patricia Adcock, who states that a number of the samples at issue were special. However, when Ms. Adcock was pressed it became clear that she had no independent recollection and no documentation regarding the purpose of the samples. Rather, she testified that the samples in question must have been special, because if they had been routine they would have been reported to the appropriate agency. Given that the very thrust of Plaintiff's claims is that Defendants failed to report routine samples, this kind of circular reasoning is hardly sufficient to create a triable issue of fact.[3]

### (4) Site Sampling Plan Requirement

■ "Public water systems must collect total coliform samples at sites which are representative of water throughout the distribution system according to a written sample siting plan." 40 C.F.R. § 141.21(a). It is undisputed that the Defendant water systems covered by this regulation concede that prior to 1994 they had only maps. Furthermore, it is undisputed that the Lab was told that it could take samples "from any location listed on the map." This evidence is sufficient to demonstrate that Defendants did not have a written plan ensuring that representative samples would be taken from throughout the system.

Defendants contend that their maps were sufficient to meet the site sampling plan requirement. There does not appear to be any case law on this issue. Accordingly, the Court treats the issue as one of first impression. The Court concludes

---

**3.** As Plaintiff puts it, Ms. Adcock's statement is akin to a taxpayer telling the IRS that certain monies could not have been "income" because she did not pay taxes on them.

that Defendants' maps are insufficient to meet the sampling site plan requirement as a matter of statutory construction. The regulation clearly specifies the requirement that the water system utilize a "plan" dictating the collection of samples such that the samples "are representative of water throughout the distribution system." Simply providing the sampler with a map of the system with instructions to sample from any location on the map is insufficient, as a matter of law, to meet this requirement.

### (5) Estoppel

■ A party asserting estoppel against the United States must show that the United States engaged in "affirmative misconduct" and that the party reasonably relied upon the United States' conduct to its detriment. See Santamaria–Ames v. INS, 104 F.3d 1127, 1133 (9th Cir.1996).

Defendants make a number of estoppel arguments. First, Defendants contend that Plaintiff is estopped from asserting liability based upon a failure to comply with the Total Coliform Rule ("TCR") because the DHS and MCHD misled Defendants into believing that there would be a delay in enforcing the TCR in California. For example, Mrs. Adcock states in her declaration that Adelio Quiogue of the DHS told her that (1) the DHS would enforce the TCR only after California adopted the rule and (2) water systems would be told when the TCR was adopted. Mrs. Adcock also states that she was confused by letters from state agencies[4] dated December 20, 1990, February 3, 1992 and July 6, 1992. Defendants contend that based upon these communications they could not tell what their obligations were with respect to the TCR.

■ This contention is without merit. The violations asserted by Plaintiff occurred between August 1991 and February 1994. The thrust of Defendants' argument is that the above comments and correspondence left them "confused" as to their responsibilities during the relevant time frame. The Court agrees that the statements at issue were not models of clarity but concludes as a matter of law that confusing statements do not rise to the level of affirmative misconduct necessary to assert an estoppel defense against the United States. Moreover, Plaintiff introduces evidence that the TCR was highly publicized in the industry during 1988, 1989 and 1990, and that numerous workshops were offered in California during this period. In this atmosphere, Defendants' failure to seek clarification of any "confusion" they may have had was unreasonable as a matter of law.[5]

Defendants also argue that stage agencies repeatedly told Mrs. Adcock that when a sample tested positive for coliform, the proper procedure was to chlorinate or take other corrective action and then take a repeat sample. Mrs. Adcock allegedly was told that if the repeat sample tested negative no other action was required. Mrs. Adcock does not say when these conversations took place. Defendants cannot assert an estoppel defense based upon such conversations without demonstrating that those conversations occurred before the asserted violations.

Finally, Defendants raised an estoppel argument based upon alleged misrepresentations regarding special samples. These alleged misrepresentations are irrelevant to the violations asserted by Plaintiff, which do not involve special samples.

---

4. Plaintiff appears to concede that the state agencies may be considered agents of the United States for purposes of estoppel analysis.

5. The Court notes that Mrs. Adcock failed to state when her conversation with Mr. Quiogue occurred. Defendants cannot assert an estoppel defense based Mr. Quiogue's statements without demonstrating that those state-

ments were made before the asserted violations. Moreover, the Court finds that the correspondence referenced by Defendants made crystal clear that the state TCR requirements were effective as of July 1992. A number of the asserted violations occurred after July 1992. Thus the estoppel defense cannot be asserted with respect to these violations even if it could be asserted with respect to earlier violations.

### (6) Selective Enforcement

■ In the Ninth Circuit, a selective prosecution defense requires a showing that (1) others generally are not prosecuted for the same conduct and (2) the decision to prosecute this defendant was based upon impermissible grounds such as race, religion or exercise of constitutional rights. *See Church of Scientology v. Commissioner of Internal Revenue,* 823 F.2d 1310, 1321 (9th Cir.1987). Defendants have not indicated how race, religion or the exercise of constitutional rights is implicated in this case.[6]

### B. Motion Re Ninth Cause Of Action (Lead And Copper)

The ninth cause of action asserts that Defendants violated regulations regarding lead and copper content. The Court concludes that Plaintiff has introduced documentary evidence sufficient to demonstrate that Defendants did violate these regulations. Moreover, Defendants admit to violating the regulations. However, Defendants argue that (1) Plaintiff lacks standing to bring this suit, (2) Plaintiff is selectively enforcing the SDWA against Defendants and (3) Plaintiff is estopped from enforcing the SDWA against Defendants. These arguments are without merit.

### (1) Standing

As is discussed above in section III. A.(1), the August 15, 1996 letter of David Spath was sufficient to confer standing upon the United States to bring this action. Defendants contend that the letter was not sufficient to confer standing to bring suit as to the asserted lead and copper violations, because those asserted violations were not at issue when the letter was written.

■ Defendants appear to be arguing that even if the Spath letter was sufficient to confer standing upon Plaintiff to sue for violations discovered before the writing of the letter, Plaintiff was required to obtain a second letter to confer standing to sue for violations discovered after the writing of the letter. This argument defies reason and logic. It appears self-evident that once Plaintiff began litigating against Defendants, Plaintiff had the obligation to assert all known violations of the SDWA, not just those discovered prior to the letter request. Defendants have not cited, and this Court has not discovered, any authority to the contrary. Accordingly, the Court concludes that Plaintiff has standing to assert lead and copper violations against Defendants.

### (2) Selective Enforcement

As is discussed above in section III. A.(6), Defendants fail to address an essential element of a selective enforcement defense.

### (3) Estoppel

■ Defendants contend that the MCHD did not notify them of their obligations to do lead and copper sampling until 1998. Defendants refer the Court to a letter from the MCHD dated June 22, 1998. However, this letter states merely that the California lead and copper rule took effect in December 1995 and that prior to that time the EPA had been responsible for lead and copper enforcement. Nothing in the letter suggests that the MCHD had excused Defendants from their obligations to comply with federal requirements. Nor have Defendants introduced other evidence demonstrating any affirmative act on the part of state or federal agencies which reasonably could have been construed as excusing Defendants from compliance with federal requirements.

---

**6.** Defendants cite a Second Circuit case which holds that a selective prosecution defense may be asserted if the prosecution was motivated by "a malicious or bad faith intent to injure the person." *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995). Defendant has not cited, and this Court has not discovered, any Ninth Circuit decisions adopting this test.

## C. Motion Re Individual Liability Of Robert And Patricia Adcock

The SDWA provides that the Court may enter "such judgment as protection of public health may require." 42 U.S.C. § 300g–3(b). The SDWA further provides that if the Court determines that there has been a violation of a regulation or other requirement the Court may impose on the "violator" a civil penalty of up to $25,000 per day in which such violation occurs.[7] *Id.* Plaintiff requests that the Court hold Robert and Patricia Adcock individually liable for the violations of the SDWA discussed above. Defendants contend that neither the statutory language nor applicable case law establishes a basis for holding them individually liable.

The SDWA does not define the term "violator" and there are no reported cases interpreting this term. Accordingly, this Court must decide as a matter of first impression whether the Adcocks may be held individually liable for violations of the SDWA.

Plaintiff has established violations of ten different regulations. These regulations use varying language when indicating the persons or entities toward whom the regulations are directed. For example, one regulation imposes requirements upon "the supplier of water." 40 C.F.R. § 141.31(a). Several others impose requirements upon the "owner or operator" of the public water system. 40 C.F.R. §§ 141.32(a), 141.32(b), 141.33(a). The remaining regulations mention only the "public water system." 40 C.F.R. §§ 141.21(a), 141.21(b)(1), 141.21(b)(5), 141.21(g)(1), 141.21(g)(2), 141.63.

Turning to the first of these categories, the SDWA defines the term "supplier of water" to mean "any person who owns or operates a public water system." 42 U.S.C. § 300f(5). Accordingly, the regulation directed toward "the supplier of water" may be considered to be part of the second category of regulations, directed toward the "owner or operator" of the public water system. With respect to the third category of regulations, the SDWA defines a "public water system" to mean "a system for the provision to the public of water for human consumption through pipes or other constructed conveyances...." 42 U.S.C. § 300f(4). Read literally, then, the third category of regulations imposes obligations only upon the physical pipes and tanks which make up the public water systems. Obviously, such a reading could not have been intended. The only logical interpretation of the regulations is that they are directed toward the persons or entities in charge of the public water systems, i.e., the owners or operators of said systems. Consequently, the Court reads all of the regulations at issue as being directed toward the owners or operators of the public water systems.

Although the phrase "owner or operator" is used in several regulations promulgated under the SDWA, neither the regulations nor the act itself defines this phrase. In this the SDWA is similar to another environmental statute, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). CERCLA imposes liability upon "any person who at the time of disposal of any hazardous substance owned or operated any facility." 42 U.S.C. § 9607(a)(2). However, as the United States Supreme Court has recognized, "[t]he phrase 'owner or operator' is defined only by tautology ... as 'any person owning or operating' a facility." *United States v. Bestfoods,* 524 U.S. 51, 56, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). The Supreme Court therefore was forced to construe the phrase "owner or operator" according to the rules of statutory construction. Giving the word "operating" its ordinary and natural meaning, the Court concluded that an "operator" is "simply someone who directs the workings

---

**7.** The $25,000 figure contained in the text of the SDWA applies to violations occurring through January 30, 1997. Subsequently enacted regulations have increased the maximum penalty to $27,500 for violations occurring after January 30, 1997. 40 C.F.R. §§ 19.2, 19.4.

of, manages, or conducts the affairs of a facility." *Id.* at 66, 118 S.Ct. 1876. The Court further concluded that as used in CERCLA, the operator "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67, 118 S.Ct. 1876.

 Applying the same type of plain language construction in the present case, the Court concludes that an "operator" is someone who directs the workings of, manages or conducts the affairs of a public water system which are specifically related to obligations imposed by the SDWA and the regulations promulgated thereunder.[8] The United States introduces substantial evidence demonstrating that Robert and Patricia Adcock meet this definition. The Adcocks were officers, directors and majority shareholders of the corporations which actually owned the water systems. Mrs. Adcock stated in her deposition that she, her husband and her son constituted the "management" of these corporations and that they were involved in hiring and firing decisions. Mr. Adcock "had overall management responsibility," including meeting with engineers and consultants and handling the companies' finances. Mr. Adcock also attended training regarding the total coliform rule. Mrs. Adcock was in charge of dealing with the DHS and the MCHD, handling correspondence with these agencies and personally typing some Monthly Summary Reports sent to the DHS. Additionally, she was involved in arranging water sampling during 1991–1997, she was listed as the contact person at the Lab, and she was the person informed of any positive coliform reports. In fact, Mrs. Adcock was designated as one of the corporations' 30(b)(6) witnesses in this litigation.

This evidence is sufficient to meet Plaintiff's initial burden of demonstrating that Robert and Patricia Adcock were operators of the public water systems. The burden thus shifts to the Adcocks to present evidence demonstrating that they were not operators of the water systems. Defendants do not even attempt to controvert Plaintiff's showing regarding the extent to which the Adcocks personally were involved in the day-to-day management and operations of the public water systems. Instead, Defendants argue that: (1) Plaintiff lacks standing to bring this motion; (2) the SDWA cannot be construed to impose liability upon the Adcocks; (3) the underlying violations are disputed; and (4) Plaintiff is selectively enforcing the SDWA against Defendants.

Defendants' arguments regarding standing and selective enforcement are disposed of in sections III.A.(1) and III.A.(6), above. Moreover, the underlying violations have been established. The Court therefore will address only the argument regarding construction of the SDWA.

 Defendants contend that if any liability attaches, it attaches only to the corporations which own and operate the water systems and that nothing in the SDWA permits imposition of vicarious liability on the individual principals of the corporations. Defendants appear to be arguing that Plaintiff should not be permitted to pierce the corporate veil. The veil may be pierced—that is, a shareholder may be held liable—when the corporate form is being misused to accomplish wrongful purposes on the shareholder's behalf. *See Bestfoods*, 524 U.S. at 62, 118 S.Ct. 1876. However, Plaintiff does not seek to pierce the corporate veil in this case. Rather, Plaintiff seeks to hold Robert and Patricia Adcock directly liable for their personal conduct in concealing and falsifying positive coliform results and

---

8. There is no dispute that the corporate defendants rather than the Adcocks are the "owners" of the public water systems. Accordingly, the question before the Court is whether the Adcocks are "operators" such that they may be held individually liable for the violations in question.

committing other violations of applicable regulations. As the Supreme Court said when discussing operator liability under CERCLA,

> Under the plain language of the statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution. This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice.

*Id.* at 65, 118 S.Ct. 1876 (internal citation omitted). The plain language of the SDWA likewise makes clear that Congress intended to impose liability on the "violator" of the statute—that is, the person or entity directly responsible for violating the applicable statutory provisions and regulations. Nothing in the SDWA or in cases interpreting environmental statutes suggests that Congress intended persons directly responsible for violations to be shielded from liability because they were employed by or acting on behalf of the corporation which actually owned the water system. Accordingly, while the Court agrees that Plaintiff has not introduced evidence sufficient to hold the Adcocks liable solely on the basis of their status as shareholders in the defendant corporations, the Court concludes that Plaintiff has introduced evidence sufficient to hold the Adcocks liable on the basis of their personal conduct which directly violated the regulations at issue. The Court therefore will grant the motion for partial summary judgment against Robert and Patricia Adcock individually.

### D. Further Proceedings

The Court's rulings on Plaintiff's motions disposes of much of the case. However, several issues remain for resolution, including the amount of civil penalties to be imposed against Defendants and the manner in which the parties shall proceed regarding the remaining claim for fraudulent conveyance. Accordingly, the Court will set a case management conference for 10:30 a.m. on Tuesday, October 10, 2000.

### IV. ORDER

IT IS HEREBY ORDERED:

(1) Plaintiffs' motions for partial summary judgment are GRANTED; [9]

(2) The parties shall appear for a case management conference at 10:30 a.m. on Tuesday, October 10, 2000.

---

**9.** Defendants include a footnote in one of their briefs, asserting an intent to bring a constitutional challenge to the SDWA at some future date. Defendants' intent to take action in the future does not preclude this Court from granting Plaintiff's motions for partial summary judgment now. Those motions were duly noticed, fully briefed and fully argued at a hearing on October 12, 1999.