**UNITED STATES of America,**
**Plaintiff,**

**ALISAL WATER CORPORATION,**
**et al., Defendants**

**No. C97–20099 JF(EAI).**

United States District Court,
N.D. California,
San Jose Division.

April 9, 2002.

Lori Jonas, Matthew Fogelson, Environmental Enforcement Section, Environment

and Natural Resources Division, U.S. Department of Justice, Washington, DC, for Plaintiff.

Marc P. Fairman, Law Offices of Marc P. Fairman, San Francisco, CA, for Adcock Defendants.

S. Gary Varga, Monterey, CA, for Trust Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FOGEL, District Judge.

### I. INTRODUCTION

Trial in the above-entitled action commenced on December 4, 2001 and concluded on January 8, 2002. On February 7, 2002, the Court issued its Memorandum of Intended Decision outlining its proposed disposition of this matter. Having reviewed Plaintiff's proposed findings of fact and conclusions of law and Defendants' objections thereto, the Court now sets forth the factual and legal basis for its Order Appointing Equitable Receiver contemplated by the Memorandum of Intended Decision and issued simultaneously herewith. Issues related to civil penalty, which will be the subject of further proceedings, will be the subject of a future Memorandum

This case, originally filed in January 1997, arises under the federal Safe Drinking Water Act ("SDWA" or the "Act"), 42 U.S.C. §§ 300f, et seq., and its regulations. The operative complaint alleges violations of the SDWA by corporate defendants Alisal Water Corporation; Toro Water Service, Inc.; North Monterey County Water Service, Inc.; Moss Landing Water Service, Inc. (collectively, "Alisal"); and indi-vidual defendants Robert T. and Natholyn P. Adcock at nine drinking water companies in Monterey County, California. The corporate defendants are public water systems which are owned, operated or controlled by Mr. and Mrs. Adcock. Their son, Tom Adcock, currently is responsible for the day-to-day operations of the water systems. Trial Transcript ("Tr.") at 1552.

On August 23, 2000, the Court granted summary judgment establishing defendants' liability with respect to nine separate causes of action encompassing hundreds of individual violations of the Act occurring in the 1990s. *United States v. Alisal Water Corp. et al.*, 114 F.Supp.2d 927 (N.D.Cal.2000). Specifically, the Court found that Defendants failed to meet the Maximum Contaminant Level ("MCL") for microbiological contaminants, failed to report or give public notice of the MCL failures, failed to do required repeat and increased routine monitoring, failed to report the lack of repeat and increased routine monitoring as required, failed to retain documents as required, and failed to test for lead and copper in their water in a timely manner. Many of the violations found by the Court involved intentional false reporting or non-reporting. *Id.* at 932.[1] On November 8, 2001, the Court granted summary judgment establishing the liability of the corporate defendants with respect to three additional causes of action alleging further violations of the MCL for total coliform during 2000–01. The trial addressed the appropriate remedy for the adjudicated violations.

The Safe Drinking Water Act provides that a court may enter "such judgment as protection of the public health may require, taking into consideration the time

---

1. The Court's prior opinion sets forth the citations for the various regulations violated.

114 F.Supp.2d at 932 n. 2.

necessary to comply and the availability of alternative water supplies." *See* 42 U.S.C. § 300g–3(b). As set forth herein, in light of all the evidence presented at trial and upon review of the applicable law, the Court concludes that significant equitable relief, including the appointment of a receiver for certain specified purposes, is warranted in this case.

## II. DISCUSSION

### A. *The Law of Receivership Supports the Imposition of Such a Remedy in this Case*

The appointment of a receiver "represents a judicial determination that the operator of an organization may be unwilling or incapable of acting in good faith toward compliance with a judgment.... The receiver ensures certainty in the execution of a court's order." Stuart P. Feldman, "Curbing the Recalcitrant Polluter: Post–Decree Judicial Agents in Environmental Litigation," 18 B.C. Envtl. Aff. L.Rev. 809, 828 (1991) ("Feldman"). The authority of a court of equity to impose a receivership on a chronic violator of public health laws is "founded in the broad range of equitable powers available to [a] court to enforce and effectuate its orders and judgments." *United States v. City of Detroit,* 476 F.Supp. 512, 520 (E.D.Mich.1979).

A receivership is particularly appropriate where public health issues are implicated. As one court explained in appointing a receiver to run a waste disposal facility, there are "differences between the type of business in which the respective Defendants are involved and that of the ordinary private corporation or enter-

prise." *Ohio v. Chem–Dyne, Inc.,* 1980 WL 6204, 10 ELR 20387 (Ohio Com.Pl., Feb. 1, 1980), *aff'd in part, rev'd in part on other grounds,* 1981 WL 5234 (Ohio App. Oct. 28, 1981). Specifically, the court noted that "the Defendants in this case are engaged in a business that definitely affects the entire community and conceivably the water for this entire area .... [Defendant] is engaged in businesses that very definitely have a widespread effect on community life and its daily operation and is affected with a public interest which invokes the equity powers of the Court." *Id.*

Accordingly, several state and federal courts have imposed receiverships on environmental violators, including owners and operators of public drinking water systems. *See, e.g., United States v. Alder Creek Water Co.,* 1984 WL 178394, 14 ELR 20430 (D. Or. April 23, 1984) (receiver appointed in SDWA case after defendant "failed to comply with a court order to lessen the health risks posed by [defendant's water systems], and to comply with the Act's reporting and monitoring requirements"), *aff'd,* 823 F.2d 343 (9th Cir. 1987); *United States v. Acadiana Woods Add. # 2 Sewer Co.,* 41 F.Supp.2d 632 (W.D.La.1999) (receiver appointed to run defendants' sewage treatment plants to secure compliance with CWA); *City of Detroit,* 476 F.Supp. 512 (administrator appointed to run City's wastewater treatment plant to obtain compliance with CWA); *see also Town of Greenwich v. Dep't of Transp.,* 1979 WL 30063 (D. Conn. Nov. 7, 1979); *Ohio v. Chem–Dyne Corp.,* 1981 WL 5234; *Dep't of Envtl. Prot. v. Emerson,* 563 A.2d 762 (Me. 1989).[2]

---

**2.** Although in each of the cited cases a receiver was appointed only after the defendant had violated a court order requiring compliance, "there seems to be no reason ... for a rigid

rule requiring as a prerequisite that injunctive relief have been attempted and have failed." Comment, "Court–Created Receivership Emerging As Remedy For Persistent Noncom-

■ Courts appointing receivers focus on defendants' actual ability to manage their facilities in compliance with the law. As the district court noted in *City of Detroit* in appointing a receiver to run the city's sewage treatment plant, "[p]resent management is consumed by the demands of crisis operating conditions that command priority over personnel, planning, budgeting, process evaluation, and other administrative functions. As with other problems at the plant, this situation feeds on itself[.]" *City of Detroit,* 476 F.Supp. at 517–18 (quoting consultant's report). The court also focused on defendant's failure to train staff adequately, and to submit a continuing training program to regulators. *Id.* at 517. The district court in *Acadia Woods* also relied in part on defendants' failure to have "sufficient numbers of properly trained personnel to operate or to adequately maintain their sewage treatment plants." *United States v. Acadia Treatment Systems,* 41 F.Supp.2d 632, 633 (W.D.1999).

Courts also have focused on a defendant's financial ability to comply. In appointing a receiver to run defendants' sewage treatment plants in *Acadia Woods,* the court found compelling the fact that "[n]either the named defendants in this proceeding nor any subsidiary corporation or corporations or officers thereof have the financial ability to conduct the current business of defendants in an environmentally

sound manner to protect the public health or to secure the necessary capital from a lending institution to do so." *Acadia Woods,* at 634.

A court order appointing a receiver and divesting a defendant of water companies that are non-compliant appears to be well within the scope of remedies contemplated by Congress in enacting the SDWA. The legislative history of the SDWA's enforcement provision, Section 1414, expressly states that "courts which are considering remedies in enforcement actions under this section are not to apply traditional balancing principles used by equity courts. Rather, they are directed to give utmost weight to the Committee's paramount objective of providing maximum feasible protection of the public health . . . ." H.R.Rep. No. 93–1185, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin. News, 6454, 6476. Moreover, Congress expressly contemplated that some small companies might not be able to comply and would be forced out of business. The legislative history provides:

> It is evident that what is a reasonable cost for a large metropolitan (or regional) public water system may not be reasonable for a small system which serves relatively few users. The Committee believes, however, that the quality of the Nation's drinking water can only be up-

pliance With Environmental Laws," 10 ELR 10059 (1980) ("Comment"). Rather, where public health is sufficiently at risk, "courts should be prepared to turn to receivership without the formality of waiting for an injunction to be disregarded." *Id.* Another commenter has similarly suggested that "[t]here is no compelling reason . . . for a court to wait until severe environmental harm has transpired or a defendant has flouted statutes and consent decrees before the court exercises the full scope of its equitable power. In the face of likely dangers to the . . . public welfare, a court may choose initially and immediately to

place an entity under receivership." Feldman, 18 B.C. Envtl. Aff. L.Rev. at 832. *Cf. United States v. Midway Heights County Water Dist.,* 695 F.Supp. 1072, 1076 (E.D.Cal.1988) ("This court need not wait to exercise its authority [to issue an injunction] until water district customers have actually fallen ill from drinking Midway Heights water"). In any event, as is set forth below, Defendants in this case have demonstrated a chronic pattern of resistance to and non-compliance with governmental efforts to regulate their corporate behavior, although this Court itself has not issued an injunction.

graded if the systems which provide water to the public are organized so as to be the most cost-effective. In general, this means larger systems are to be encouraged and smaller systems discouraged.

H.R.Rep. No. 93–1185, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin. News 6454, 6470.

■ The evidence presented at trial convinces the Court that the imposition of some form of receivership on the defendant water systems is unavoidable in this case. As set forth below, the adjudicated violations are serious and include falsification of records designed to protect public health; Defendants have a long history of such violations and others; Defendants have adopted an inordinately combative stance against legitimate regulatory oversight and have maintained that stance for more than a decade; Defendants repeatedly have failed to accept responsibility for their conduct, seeking instead to shift blame to others including the regulators themselves; Defendants lack the managerial competence to operate compliant drinking water systems; and Defendants lack the financial wherewithal to operate compliant drinking water systems. In light of these findings, the Court concludes that "the usual remedies are inadequate" and that some form of receivership is necessary "to get the job done." *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976) (affirming appointment of receiver in non-environmental context).

B. *The Evidence Demonstrated That the Violations of the Act Found by the Court Were Indeed Serious*

1. The Violations Undermine the SDWA

Since the overwhelming majority of drinking water systems are never sampled by an independent party, self-monitoring and truthful reporting are critical to the success of the Act in that they represent the only way for the government to determine if a drinking water supply system is safe. *In the Matter of ANTHONY J. TAYLOR*, 1992 WL 293140 (E.P.A.1992). The former head of EPA Region IX's drinking water program, William Thurston, confirmed this, testifying that self-monitoring by water systems is the primary way that regulators and the public know about the quality of water. Tr. at 54. As the court in *United States v. City of North Adams*, 1992 WL 391318, *2, noted: "neglect in taking and testing water specimens is tantamount to closing one's eyes to possible water-supply contamination." The court there held that failure to monitor and analyze drinking water samples was a serious violation. *Id.*

In this case, Defendants not only failed to monitor and report results of water samples, but also reported numerous *false* results, at best with gross negligence and at worst with conscious intent to deceive. Defendants continue to fail to monitor for lead and copper, as required by law. Tr. at 954–55. Such falsifications and failures to report were not isolated incidents. In addition to the failures to report and falsifications adjudicated by this Court on summary judgment, the evidence at trial included proof of even more falsifications. William Ray, an investigator for the State of California's Environmental Laboratory Accreditation Program, testified that documents found at Alisal's testing laboratory tended to support positive sample results, not the negative results reported by Alisal to regulators in the mid–1990s. Tr. at 321. Mr. Ray further testified that Alisal submitted laboratory results showing that approximately fifty analyses had been performed, while the supporting documentation provided by the testing laboratory demonstrated that only a fraction of the reported constituents had been sampled

for. Tr. at 324–38. In one instance, incredibly, Alisal claimed some fifty results for a sample that did not even exist. *Id.*

The evidence at trial also gave reason for concern that such falsifications may be continuing. James Hively of the Monterey Bay Aquarium Research Institute (MBARI), a customer of Defendants' Moss Landing system, testified that he sampled for nine months in 2000 at the Moss Landing system and obtained numerous coliform positive results from both within and outside of MBARI. Tr. at 355–74. At the same time, Alisal reported uniformly negative samples for the system to regulators. Plaintiff's Trial Exhibit ("Pl.Exh.") 106. Alisal's results for the Vierra Canyon system also were clean during this time period. *Id.* Yet, once the Monterey County Health Department ("MCHD") got involved, it found widespread contamination at both systems. Tr. at 435–37; 476–77. This contamination led to boil water orders for both systems. Only at this point did defendants' results begin to show contamination. *See* Exh. 3, 5 to Decl. of Cheryl Hall (10/1/01).

Although they object to the Court drawing any adverse inferences from these facts, Defendants offered no credible innocent explanation at trial for the inconsistent results. Several explanations are possible, but none of them reflects favorably on Defendants. Either Defendants' samples or their supporting documentation were tampered with, the water tested was not drawn properly from the subject systems or some type of incompetence or mistake led to inaccurate results. The government's expert, Gene Reade of the State Department of Health Services

("DHS"), questioned expressly the accuracy of the Moss Landing results, Tr. at 1112–13, as did Cheryl Hall of the MCHD. Tr. at 907. Mr. Reade was even more critical with respect to the results from the Vierra Canyon system, stating that he could not understand, given the extreme state of disrepair of the system (one of the worst he has seen), how the system did not produce a single positive coliform result for years prior to the boil water order. Tr. at 1123, 1141. The Court found Mr. Reade's testimony credible.

Defendants' unlawful and, at times, unscrupulous behavior clearly undermines the Act, and, in fact, hardly could do more damage to it. Accordingly, the Court finds that the violations are serious. *See United States v. Smithfield Foods, Inc.,* 972 F.Supp. 338, 348 (E.D.Va.1997), *aff'd in part, rev'd in part,* 191 F.3d 516 (4th Cir.1999) ("When a permittee falsifies DMRs [pollution monitoring reports], fails to maintain supporting records, or destroys records, the permittee may be covering up serious violations of effluent limitations.... Since the Clean Water Act relies on self-reporting of permittees, such violations undermine the Act and are considered serious ..."); *Hawaii's Thousand Friends v. City & Cty. of Honolulu,* 821 F.Supp. 1368, 1384 (D.Hawai'i 1993) (noting that the failure to report is more significant than the violation because it deprives the regulatory agency critical opportunity to investigate and rectify the situation).[3]

### 2. The Violations Have Had a Serious Impact on Users

The violations in this case also are serious in terms of the toll they have taken on

---

**3.** The critical importance of timely and accurate self reporting has been highlighted and emphasized in a number of SDWA cases. *See, e.g., United States v. Neskowin Enterprises, Inc.,* 10 Envtl. L. Rep. 20622, 20626, 1980 WL 98393 (D.Or. June 3,1980); *In re Sun-* *beam Water Co.,* Docket No. 10–97–006, 1999 WL 1013077, 1999 EPA ALJ LEXIS 79 at \*25 (October 28, 1999); *In re: Leisure Valley West et al.,* Docket No. SDWA–III–023 et al., 1999 WL 504717, 1999 EPA ALJ LEXIS 53 at \*14 (June 25, 1999).

Alisal's users. The customers of the Moss Landing system were subject to a five-week boil water order in 2000 because of the widespread contamination present in that system. Tr. at 439, 469. Those customers included residences, educational facilities, restaurants and live-aboard boats. Tr. at 429–32. At the time of trial, customers of the San Jerardo system were using bottled water for all consumption needs as a result of nitrate contamination. Tr. at 1865. Although clearly a major inconvenience for these individuals, the plight of the Moss Landing and San Jerardo customers pales in comparison to that of the customers of the Vierra Canyon system who were forced to boil their water for ten months in 2000–01. Tr. at 909, 940.

The Court heard testimony from Carl Chase, a customer of the Langley Valle/Pacifico system, that the water provided by Defendants on at least one occasion burned his daughter's skin and was deemed undrinkable by his family. Tr. at 695, 686. There also was evidence that Defendants' water, when it actually was being provided and had adequate pressure, caused gastrointestinal distress and had strange colors and odors, and that these conditions persisted for more than a year in the case of the Langley system and for long periods at Vierra Canyon, Buena Vista, and Alco. Pl. Exh. 70, 71, 162–69, 170–76; Tr. at 634–35, 709, 424, 508, 942, 676; 30(b)(6) Depo. of Alisal et al. (11/3/98) at 30–34, 54.

### 3. The Violations Pose a Serious Threat to Public Health

Defendants' actions posed a serious health threat because they resulted in the provision of water that repeatedly failed the MCL for total coliform. *See* 114

F.Supp.2d at 932. Failure of this MCL has been deemed serious by a number of courts. *City of North Adams,* 1992 WL 391318, *1–2 ("MCL violations for coliform bacteria are particularly grave ... the presence of coliform is an indicator of the potential existence of pathogens in water ... These intestinal microbiological organisms pose a keen threat to persons, especially the young or the elderly, who ingest them.... Although plaintiff documented no mass outbreaks of illness, the enhanced risk of disease sufficiently demonstrates the gravity of the coliform MCL violations."); *see also United States v. Midway Heights County Water Dist.,* 695 F.Supp. 1072, 1076 (E.D.Cal.1988); *Neskowin Enters., Inc.,* 1980 WL 98393, 10 Envtl. L. Rep. at 20626.

The government submitted the testimony of Dr. Paul Berger, a toxicologist. Dr. Berger's testimony indicates that the presence of total coliforms is a good indicator of the vulnerability of a system to bacterial and other viral pathogens in a water supply. Written testimony of Paul Berger at ¶ 14. Defects in a system's integrity that allow total coliforms to live also allow for the entrance of fecal pathogens, which cause any number of diseases. *Id.* In Dr. Berger's opinion, the data in this case suggest that the Alco, Moss Landing and Vierra Canyon systems were and may still be vulnerable to fecal pathogens. *Id.* at ¶ 19. Moreover, the absence of evidence demonstrating actual illness is not proof that such illness did not occur. *Id.* at ¶ 20.[4] According to the literature relied upon by Dr. Berger, waterborne disease is greatly underreported for a variety of reasons, and an incidence of waterborne disease may occur even without a community's knowledge. *Id.* at ¶¶ 20–22. As this

---

4. In fact, there was evidence of complaints of gastrointestinal distress from Moss Landing users. Pl. Exh. 70, 71.

Court has found, instead of re-sampling and/or treating water that tested positive for total coliform, or informing health department officials who could take appropriate action, Defendants simply failed to report positive results or falsely reported instead that the water was safe. 114 F.Supp.2d at 932. Users thus were put at additional risk.

Further, Defendants failed to sample their water for lead and copper contamination when they were required to do so, *id.* at 936, and thus obtained no data which could be used to determine if users were at risk from excess lead and or copper between 1994 and 1998. When such sampling finally was undertaken in 1998, the copper action level was exceeded at NORMCO and Vierra Canyon. Pl. Exh. 83. This is a potentially serious health issue. As the government's expert, Dr. Paul Mushak, testified, copper is associated with acute and chronic effects, and copper at the levels found in Defendants' water poses an unacceptable risk of liver damage in infants. Tr. at 718–29.

The seriousness of the violations was exacerbated by Defendants' repeated letters to their customers containing misleading information, including letters indicating that samples were free of coliform when in fact the samples contained high levels of chlorine that likely masked the presence of coliform. Tr. at 445–47; 453–54; 501. Defendants added to a potentially dangerous situation at the Moss Landing and Vierra Canyon systems by publishing a letter to their customers in the local newspaper in September 2000. Pl. Exh. 209. The letter intimated that the water in those systems was safe, even though Boil Water Orders were then in effect at the systems. Customers' health could have been at risk if the customers believed the misstatements and thus did not comply with the Boil Water Orders.

4. Defendants Presented No Compelling Counter–Evidence Regarding Seriousness of the Violations

Defendants did not produce any compelling evidence to contradict a finding that the violations are serious. Indeed, Tom Adcock conceded that many of the violations were in fact serious. Tr. at 1899–1901. As to certain months in which positive coliform samples were omitted from reports submitted by Defendants to State regulators, Defendants offered the explanation that perhaps these results were received late by the water systems. Tr. at 1450. In addition to the fact that there is no evidence supporting this theory, the explanation is no defense at all. If, after it submitted its monthly report, Alisal learned that in fact it had a number of positive coliform sample results, it had an obligation to amend its report. It failed to do so. The reasonable inference is that the reports were intentionally falsified, or at best that Defendants knowingly permitted inaccurate reports to remain uncorrected.

As to the potential impact of their conduct on public health, Defendants assert that the amount of copper in drinking water sanctioned by EPA essentially is too protective of human health and that copper levels above the EPA limit are not harmful. Tr. at 835. However, the studies upon which their expert, Dr. Becking, relies are not generally accepted in the United States, and Dr. Becking's opinion recently has been rejected by the National Academy of Sciences. Tr. at 835, 836–39. As to the many positive coliform samples, defendants offer nothing other than their view that the absence of fecal or *e coli* contamination shows that the violations were not serious. This claim is contradicted by Dr. Berger's unrebutted expert testimony.

### C. The Evidence Demonstrated that Defendants Have a Long History of Violations

The evidence at trial offered voluminous, detailed proof of Defendants' fifteen year history of non-compliance with drinking water laws and regulations. Although Defendants showed that most of the reporting violations adjudicated by the Court occurred in the early 1990's and that their record of compliance in this respect improved beginning in late 1994, the government established that reporting violations, inaccurate test results and unreasonable delay in addressing incidences of contamination characterized Defendants' management of the water companies through and including the time of trial.

In its order granting the government's first motion for summary judgment, this Court found violations by Defendants of the Total Coliform Rule ("TCR"), 40 C.F.R. Part 141 (various sections), beginning in 1991. 114 F.Supp.2d at 932. In its order granting the government's second motion for summary judgment approximately a year later, the Court found that there were additional violations of MCL for total coliform even after summary judgment was granted. Nov. 8, 2001 Order at 5.[5] Defendants had actual knowledge no later than 1993 of the regulation requiring them to sample their drinking water for the presence of lead and copper, when they received a Notice of Violation from EPA with regard to the Alco system. Tr. at 1858. Nevertheless, most of Defendants' systems did not test for lead and copper until 1998. See 114 F.Supp.2d at 936. Defendants admit they only did so on advice of counsel. 30(b)(6) Depo. of Alisal, et al. at 79.

In addition to the violations adjudicated on summary judgment, there was evidence at trial of the following: in 1986, Alco failed to do required routine and repeat sampling (Pl.Exh. 1); in 1987, it still failed to submit required sampling (Pl.Exh. 2); in 1990, both Alco and Toro failed to submit routine sample results as required (Pl. Exh. 7, 8); in 1990 and 1991, both Alco and Toro failed to distribute their annual water quality reports as required (Plaintiff's Exh. 9, 11, 12); beginning in 1989 and through 1993, both Alco and Toro failed to monitor for organics, inorganics, minerals and radioactivity (Tr. at 120–23); in 1990, neither Moss Landing nor Blackie Road tested for coliform as required (Pl.Exh. 68, 69); in 1990, San Jerardo had coliform in its water as found by the County (Pl.Exh. 72, 73); Wildwood's water also showed coliform in 1990 (Pl.Exh. 74); in 1991 and 1994, Vierra Canyon's water showed coliform as found by the County (Pl.Exh. 75, 77); in October 1993, Toro failed to submit its monthly bacteriological samples (Pl. Exh. 31); in 1995, the County issued a Compliance Order to Langley Valle/Pacifico for failure to provide continuous, wholesome and potable water (Pl.Exh. 79); in 1995, Toro failed to take repeat samples within the time required by law (Pl.Exh. 40); in 1995, Wildwood failed to do required follow up sampling (Pl.Exh. 107); in 1995, Defendants exceeded the allowable number of connections at Alco and Toro (a problem that has been ongoing at Alco since September 2000) (Pl. Exh. 41; Tr. at 188–90); and in 1996, the County again ordered Langley Valle/Pacifico to address its water quality problems (Pl.Exh. 81). From 1994 until the summer of 1998, Defendants were in continuous non-compliance with the lead and copper rule. See 114 F.Supp.2d at 936. Moreover, as Che-

---

**5.** The November 8, 2000 Order addressed the 2000–01 MCL violations at Moss Landing and Vierra Canyon.

ryl Hall of MCHD testified, Defendants are again behind on lead and copper testing for almost all of their systems, despite this Court's August 2000 Order finding Defendants liable as to Count Nine of the operative complaint, which alleges violations of the lead and copper rule. Tr. at 954–55.

Defendants' history also is notable for ongoing customer complaints about water quality: in 1990, people at Moss Landing complained about stomach problems (Pl. Exh. 70, 71); in 1993, customers at Pine Canyon complained about water quality (Pl.Exh. 76); in 1995, people at Vierra Canyon also complained about water quality (Pl.Exh. 78). As Carl Chase testified, his group of homeowners complained about water quality at Langley/Valle Pacifico from 1995 until early 1997, and again from the summer of 2000 to the summer of 2001. Pl. Exh. 162–69; 170–76. From 1994 to 1998, the County received an unusually high volume of complaints from the users at Buena Vista about water quality, water outages and water pressure. Tr. at 634–35.

The history of non-compliance continued through the late 1990s. In July of 1998, Elizabeth Karis of the MCHD advised Moss Landing to implement a cross control prevention plan to prevent the entrance of contaminants into the domestic supply. Pl. Exh. 109. As numerous witnesses testified, this still was not done by the summer of 2000, perhaps causing the Moss Landing boil water order. *See, e.g.,* Tr. at 451–52. When the County went to look for records of the cross connection plan in 2000, for the most part such records did not exist. Tr. at 644. Additional-

ly, in December 1999, the Vierra Canyon system failed the MCL for iron. Pl. Exh. 99. Defendants' violations of primary drinking water standards continued even during the pendency of the trial: Alisal failed the MCL for total coliform at San Jerardo in December 2001. Pl. Exh. 224, 225.

D. *Defendants Have a Demonstrated History of Combativeness with Regulators*

Perhaps the most vexing aspect of this case from the Court's point of view is the manner in which Defendants have interacted with regulatory agencies over the past decade. While regulators make mistakes, and any person or entity subject to governmental regulation has the right to disagree with regulators and seek legal redress when it is appropriate to do so, Defendants conduct, as discussed above, reflects a persistent pattern of non-compliance with the most basic responsibilities of a public utility. Accurate, timely testing and reporting and a prompt, effective response to unsafe conditions hardly are too much to ask of a provider of public drinking water.

As the evidence at trial demonstrated, Defendants typically made little or no effort to comply when their inadequate performance was pointed out to them. Rather, State and County regulators devoted years in fruitless efforts to obtain better performance from the companies.[6] Cathy Ma of the DHS testified to repeated reminders to the companies that they needed to take routine bacteriological samples monthly, the most basic aspect of the Act's

---

6. In California, the State DHS is the agency with primary enforcement responsibility with respect to public water systems. The DHS in turn has agreements with local primary agencies ("LPAs") under which the LPAs enforce the SDWA as to certain public water systems.

One such LPA, the MCHD, has primary enforcement responsibility with respect to some of the water systems at issue in this action while the DHS retains primary enforcement responsibility with respect to others. 114 F.Supp.2d at 930.

monitoring regime. Pl. Exh. 1, 2, 7, 8, 21, 31. There was similar evidence of the defendants ignoring repeated reminders to prepare and distribute annual reports to consumers and conduct chemical testing on their wells. Pl. Exh. 9, 11, 12, 15, 16, 17, 18, 22, 23. Indeed, Ms. Ma testified that in the early 1990s, the State spent on average ten hours per year on enforcement-related activities for large systems. Tr. at 193–95. In contrast, it spent hundreds of hours on enforcement activities for Alco and Toro in those years. *Id.*

The evidence with regard to the small, County-regulated systems is the same. Mary Ann Dennis of MCHD testified that even prior to 1990, it was very difficult to work with Defendants. Tr. at 404. They often failed to follow through on promised actions, and the County received a high volume of complaints about the companies. *Id.* Further, as Ms. Dennis and Cheryl Hall testified, Defendants' record in this regard has not improved. Tr. at 512, and generally 890–940.

Rather than comply with directives from regulators, Alisal's overarching regulatory philosophy has been to litigate when challenged and to give no ground. Consequently, Alisal has chosen to file several petitions for writ of mandamus strenuously opposing various citations issued by the State and County. At least some of the arguments in support of these petitions appear hyper-technical or even frivolous. Norman Knoll, counsel to DHS, testified that Alco filed three writ petitions against the State regarding three citations issued in 1993. Written testimony of N. Knoll at 3. The directives in these citations are so minimal that a company interested in compliance easily could have complied and tried to do better in the future. Pl. Exh. 21, 22, 23. Yet, rather than comply and devote itself to providing safe water, Alisal

chose to fight, thus setting in motion the current lawsuit. Tr. at 172.

The same approach of litigation rather than cooperation can be seen by examining the citation by the County regarding the 2000 Moss Landing incident. Pl. Exh. 96. The directives are minimal: hire an independent sampler; have the lab send copies of results directly to the County; submit a report regarding the cause of the contamination; implement a cross connection control plan; cease adding unapproved chemicals to the water supply; and submit information on the number of connections. *Id.* These requests are little more than what the law on its face requires. Even Tom Adcock testified at trial that the company had no real problem with any of these requests. Tr. at 1880. Yet rather than simply comply, Alisal hired an attorney to contest the citation and file suit in state court, contending (contrary to established law) that Defendants were entitled to a hearing on the citation before it was issued and claiming that the water at Moss Landing was not drinking water so it was acceptable to add unapproved chemicals to it. Pl. Exh. 100, 101. Alisal's own notice to customers stated that the water could be consumed after boiling. D. Exh. 65. Indeed, the act of boiling water can serve to concentrate chemicals present in the water. Tr. at 1110–11.

The record in this case is replete with evidence of Defendants' acts of intransigence and lack of cooperation with regulators:

- Every one of the citations issued by the State showed repeated, but unavailing, informal efforts to obtain compliance through repeated phone calls and letters that went unanswered. Pl. Exh. 1, 2, 7, 21, 22, 39.

- Rather than use State-approved language in a required notice to custom-

ers concerning the November 1992 MCL failure at Alco, the Adcocks sent a letter to Alco users with misleading and false information. Tr. at 157–60.

- Tom Adcock, in response to a request by the State for information concerning the number of service connections at Alco and Toro, delivered fifteen boxes of documents at the State offices and told the State officials to figure it out. Tr. at 394–95.

- Tom Adcock added a non-approved chemical to the water system at Vierra Canyon even though Gene Reade of DHS personally instructed him not to add the chemical—sodium thiosulfate—and despite the fact that, as Mary Anne Dennis testified, one easily could determine that the substance was not approved for human consumption by looking on the Internet. Tr. at 456–57, 1108–09.

- Tom Adcock wrote a number of letters to Mary Ann Dennis with respect to her request that Alisal not add chemicals to the systems without permission. Pl. Exh. 91, 93, 94. As Ms. Dennis testified, it seemed obvious that she was referring to substances such as the sodium thiosulfate, not regular disinfection after work on the system. Tr. 463–64. Ms. Dennis testified that it was, and remains, typical of Tom Adcock to question the County's directives in this manner. Tr. at 462.

- In October 2000, Tom Adcock told Elizabeth Karis that he would fight the County on its request that Alisal automate the Vierra Canyon system. Pl. Exh. 111.

- During the boil water events at Moss Landing and Vierra Canyon, Alisal failed to include language requested by the County in letters Alisal sent to customers. Tr. at 445–46; 452–54.

As a consequence, the letters were misleading and the County was forced to post accurate information on a daily basis at the local post office. *Id.*

- Defendants published an advertisement in September 2000 in the local newspaper which contained several misleading statements about this Court's summary judgment Order, including that the Court did not find that Alco falsified lab reports or hid violations and that the Court's findings suggested paperwork violations. As Tom Adcock admitted, the company was involved in the drafting of this document. Pl. Exh. 209; Tr. at 1840.

- Even though Carl Chase, a customer of the Langley/Valle Pacifico system, was able to identify for Alisal the amount of chlorine that needed to be kept in the system for the water to be acceptable, Alisal did not maintain this level of chlorine, but allowed its customers to suffer with poor water quality. Tr. at 692. The best an Alco technician could do, Mr. Chase testified, was simply shrug his shoulders. Tr. at 686. Tom Adcock also instructed Mr. Chase not to talk to his technicians. Tr. at 707.

- Defendants' defiant behavior prolonged the Vierra Canyon boil water order for months. Tr. at 919–39. In Mary Ann Dennis's view, the Vierra Canyon contamination event should have been resolved within two months, not the ten months it took. Tr. at 506.

- Even though the County had told Alisal in the early fall what was required for the Vierra Canyon Boil Water Order to be lifted and the chlorination permit to be granted, Tom Adcock continued to write letters asking that the order be lifted when these conditions had not been met. Tr. at 919–39.

At the same time, the company failed to communicate with Ms. Hall about what it was doing to resolve the problem. Tr. at 9924.

- Alisal failed to instruct its sampler to take chlorine residual readings at Vierra Canyon even though, as Mary Ann Dennis testified, this issue had repeatedly been raised to the company. Tr. at 501–04.

- The report of the independent engineer concerning the Vierra Canyon contamination event that was requested by the County in October 2000 was not provided until May 2001, despite the fact that it was completed by the engineer in December 2000. Tr. at 926, 937.

- Alco failed to make diligent efforts to communicate to its customers about the status of the boil water orders. The County received complaints from users at Moss Landing that they were not told of the initiation of the boil water order, and from users at Vierra Canyon that they did not know of the lifting of that order. Tr. at 941, 448.

- Regarding San Jerardo, Alisal could have and should have taken a proactive approach to the impending nitrate MCL failure by seeking permission to dig a new well or install treatment. Tr. at 670–73. Rather, Alisal allowed the MCL to be violated, thereby necessitating the provision of bottled water. *Id.*

- Alisal corresponded with regulators and paid bills on behalf of the tiny El Camino Real system for ten years, never hinting that it did not own the system until August 2001, when it learned the MCL for nitrates has been exceeded, at which time it claimed it had no connection to the system. Tr. at 949–52.

The only times that the regulators were able to get timely compliance from Defendants were when threats were made that would have had an immediate impact on Alisal's bottom line. The State was able to get the chemical test results it had been seeking for three years within 72 hours when it threatened to shut down one of Defendants' wells in June 1994. Tr. at 169–70. The State was able to get information on service connections at Alco in 1995 when it imposed a moratorium on new connections. Tr. at 188–89. With these dramatic exceptions, Defendants' record of cooperation with regulators' legitimate requests is dismal.[7]

E. *Defendants Repeatedly Have Failed to Accept Responsibility for Their Conduct*

Defendants' approach at trial, as it appears to have been for more than ten years, was either to minimize the significance of their own conduct or to blame the situation on the regulators. For example, Patricia Adcock testified that it was Alisal's lawyer, not herself or anyone else connected with the companies, who drafted the letter to Alisal's customers that mischaracterized this Court's summary judgment Order. Tr. at 1457. Yet Defendants admit that they reviewed the advertisement before it was published. Tr. at 1840.

Mrs. Adcock suggested that the County was responsible for Alisal's chronic non-

---

7. The duration and extent of Defendants' history of non-compliance leads the Court to conclude that the drastic remedy of a receivership is not only justified but also necessary. There is very little in the record which would suggest that Defendants reasonably could be relied upon to change their entire corporate culture simply because this Court issued an injunction. In fact, Defendants' evident misunderstanding of the significance of this Court's order granting the government's motion for summary judgment very much suggests the opposite.

compliance since it did not keep the company adequately appraised of regulatory developments. Of course, it is Alisal that is charged with that responsibility. *Emery Mining Corp. v. Secretary of Labor,* 744 F.2d 1411, 1416 (10th Cir.1984). Notwithstanding that responsibility, Mrs. Adcock testified that she never read the text of the SDWA or its implementing regulations. Tr. at 1485.

Defendants also suggest that the County was responsible for the fact that the Vierra Canyon boil water order was not lifted for ten months. *See generally* testimony of Tom Adcock. The evidence clearly showed, however, that the system was responsible for the fact that Order extending for as long as it did.

Defendants' theories are not supported by the evidence. Virtually all of the state and county regulatory personnel who testified at trial described how difficult it was to obtain the most basic cooperation from Defendants, how the amount of time they devoted to dealing with problems related to these water companies far exceeded the time they were required to spend overseeing other utilities under their jurisdiction and how defendants typically tended to take matters into their own hands rather than work with regulators. There was no credible evidence that any regulatory agency was overzealous or exceeded its authority in its dealings with Defendants To the contrary, the evidence showed that in virtually every instance, the regulators made extensive efforts to resolve matters informally with Defendants before taking any official action and sought only minimal sanctions when they did take action. Defendants responded with objections and litigation. The federal government became involved only when local regulators concluded after years of frustration that they lacked sufficient resources to obtain compliance. Tr. at 172.

Given an opportunity at trial to reflect on Defendants' past performance, Patricia Adcock neither took responsibility nor expressed any regret for any past conduct. One might have expected her to testify that she ordered a top-to-bottom review of sampling protocols to ensure that such events did not re-occur. No such testimony was forthcoming. Tr. at 1498–1505. To his credit, Thomas Adcock acknowledged that a number of the violations which occurred in the early 1990's were serious in nature and that both the administration and physical infrastructure of defendants' companies require significant modernization. Tr. at 1812–15; 1899–1900. Even he, however, appeared to suggest that Defendants' more recent difficulties at Moss Landing, Vierra Canyon and San Jerardo were the result of unreasonable regulatory demands rather than any serious failing on the part of management. *See generally* Testimony of Tom Adcock. The Court found the evidence as to actual responsibility for these unfortunate events to be compelling and strongly supportive of the government's position.

In short, it is impossible to consider the evidence presented before and at trial and not reach the conclusion that Defendants simply do not appreciate the seriousness of the conduct for which they have been found legally responsible.[8]

F. *Defendants Lack Sufficient Managerial Competence to Comply with the Act*

The evidence at trial shows that Defendants lack the managerial resources and

---

8. One only can speculate as to whether the present proceedings would have been necessary had Defendants directed the hundreds of thousands of dollars they apparently have spent litigating their disputes with regulatory agencies to improving the infrastructure of the water systems.

expertise to manage effectively the numerous water systems for which they are responsible, especially the smaller ones. By way of example, there was evidence of the following:

- The contamination of virtually all the systems with bacteria at levels that violated the MCL.

- The failure to prevent dangerous cross connections at Moss Landing despite the fact that the company has two certified water system operators. Tr. at 1100–1106.

- The failure of Defendants' testing to show the true condition of the water at Moss Landing and Vierra Canyon. Tr. at 436, 906–07.

- The failure of Tom Adcock to explain either the contamination or the fact that there was chlorine in the water at Moss Landing. Tr. at 439.

- The failure of Tom Adcock to realize the dangers in adding sodium thiosulfate to the water supply at Moss Landing. Tr. at 1109–10.

- The poor conditions at Moss Landing and Vierra Canyon during the boil water orders, including: a frog present in one of the storage tanks at Moss Landing; holes in the roofs of tanks at the Vierra Canyon system; vegetation growing in tank vents; the failure of Tom Adcock, Jr. to know which tanks were in service at Moss Landing, or how to collect a sample from a storage tank. Tr. at 1094–98, 1123; 910–12.

- The pumphouse at Moss Landing overflowed water because of known defects in the system that management did not fix. Tr. at 891–93.

- No one at the company realized that the well head samples from Moss Landing were showing high chlorine residuals and that, therefore, something was clearly wrong with them. Tr. at 1113–1115; Tr. at 902–03.

- Tom Adcock spent weeks using improper methods to disinfect the tanks and wells at Vierra Canyon but failed to close-up the system to prevent additional contaminants from infiltrating or recontaminating the system. Tr. at 1124–30, 1136–38.

- Alisal's incompetence needlessly prolonged the boil water order at Vierra Canyon. Gene Reade testified that it typically takes 3–4 weeks to resolve a contamination event like the one at Vierra Canyon and that Tom Adcock's failure to disinfect the system properly prolonged the boil water order. Tr. at 506, 1140, 1143.

- Defendants' incompetence also has resulted in the current nitrate problems at the San Jerardo system. Cheryl Hall and Elizabeth Karis both testified that a responsible water purveyor would not have allowed the system to worsen to the point where customers were forced to use bottled water. Rather, a responsible operator would have begun the process of digging a new well once the nitrate concentrations in the water began approaching the MCL. Tr. at 670–73, 946–48.

- Cheryl Hall and Mary Ann Dennis both compared Alisal unfavorably to the other public utilities they oversee in Monterey County. Tr. at 509, 955–56.

- Brian McKeown, the United States' expert, testified that the list of things that need to be done to repair and upgrade the Alisal systems demonstrates a lack of proper operation and maintenance. Tr. at 1038–39.

- Both Brian McKeown and Gene Reade testified to a lack of confidence that Defendants have the managerial competence to prevent future violations. Tr. at 1036, 1062–64; 1140–41, 1143. As Mr. McKeown put it, Alisal does not

have the human resources necessary to implement the plan required to attain compliance. Tr. at 1062–64.

The Court found no credible evidence disputing these incidences of managerial incompetence.

### G. *Defendants Lack Sufficient Financial Resources to Comply with the Act*

The evidence at trial demonstrates that Defendants lack the financial wherewithal to operate their systems in a manner which will ensure the protection of public health. The evidence is that Alisal needs to invest some $8.3 million over the next five years to bring its systems into full compliance with the law and $750,000 just within the next 12 months. Tr. at 1035, 1058–1060; Pl. Exh. 206, 207A. This is work that is necessary simply to get the water systems into compliance with applicable drinking water regulations. Tr. at 803. As Lynn Putnam of the engineering firm of Black & Veatch, which conducted a comprehensive audit of Defendants' facilities, testified, all the work her firm recommends needs to be done or future noncompliance will likely result. Tr. at 805–06. Indeed, Ms. Putnam testified that it would not be sound management to ignore the capital improvement program recommended by Black & Veatch. Tr. at 806.

Robert Harris, the government's accounting expert whom the Court found credible, testified that Defendants do not have anything approaching the financial wherewithal to invest the amount of money contemplated by Black & Veatch. Indeed, Alisal as of Dec. 30, 2000, was in the unusual situation of having *negative* working capital, meaning that the companies have little, if any, ability to meet their current financial obligations. Tr. at 1181, 1185–86; Pl. Exh. 180. That negative working capital position is in excess of $3 million. Tr. at 1186. Alisal has approximately $5,000–$6,000 in cash. *Id.* There is no excess money going into the bank. Tr. at 1192–93. The money the company generates in revenues is all accounted for with no money left over for savings. Tr. at 1193. In fact, there is no "extra money" that could be spent on additional projects. Tr. at 1194. Mr. Harris further testified that the company has net annual cash flow of only $54,433. Tr. at 1196. This cash flow, Mr. Harris testified, is insufficient for Alisal to stay current on its obligations given its large working capital deficit. Tr. at 1196. As Mr. Harris testified, there simply is no extra money to make the capital improvements recommended by Black & Veatch. Tr. at 1194.

While certain capital expenditures theoretically could be reimbursed in the future by the through general rate increases approved by the California Public Utility Commission ("PUC"), the fact remains that Alisal will need to borrow substantial funds in the short term to get its systems up to par. Tr. at 1203. As Patricia Adcock testified in her September 2001 deposition, Alisal's need to borrow money is ongoing, as the PUC sometimes takes as long as two years to approve a general rate increase. Patricia Adcock Depo. (9/7/01) at 119. And as Marino Rodriguez, Alisal's comptroller, testified, the PUC does not approve rate increases until *after* the improvement for which reimbursement is sought has been made. Tr. at 1366.

The inescapable conclusion is that Alisal, in both the immediate and intermediate future, will continue to need to find sources of funding independent of any general rate increase ultimately approved by the PUC. The evidence is that Alisal will not be able to do so. As Patricia Adcock herself testified at her September 2001, deposition, given Alisal's dire financial straits, banks will no longer lend money to

the companies. Patricia Adcock Depo. (9/7/01) at 112–13.

Mr. Rodriguez asserted that Alisal can not only pay all its debts, including $3 million owed to plaintiffs in unrelated litigation, but also can fund any needed improvements. This assertion is belied by the evidence, including Mrs. Adcock's deposition testimony that the utilities do not have the money to pay the $3 million judgment, let alone any other debts and cost of improvements, and that Alisal's stock is worthless. Tr. at 1378–79; Patricia Adcock Depo. (9/7/01) at 87–88. The Court also heard uncontroverted evidence from Mr. Harris that neither the Adcocks individually nor the Trusts into which they transferred various assets have sufficient funds to contribute to the necessary capital improvements. Tr. at 1205–07; Pl. Exh. 180.

### III. EQUITABLE RELIEF

Defendants note appropriately that the appointment of a receiver is a drastic remedy and that the Court must consider carefully whether a less drastic remedy would be sufficient to protect public health. The Court has considered several alternatives, including not ordering any equitable relief at all. The evidence at trial, however, suggests powerfully that significant equitable relief, including the appointment of a receiver for certain specified purposes, is warranted here.

The Court concludes that to maintain the status quo, that is, to allow Defendants to continue to operate all of the water companies without judicial oversight, would be a total abdication of its judicial responsibility. This is readily apparent in light of the fact that even after numerous citations and orders were issued to defendants by state and local authorities, and even after this Court granted summary judgment with respect to more than 200 violations of the Act, significant violations of the Act continued. Indeed, further serious violations occurred even during trial. The seriousness, duration and willfulness of Defendants' non-compliance with legal requirements are evidence of a corporate culture which simply "doesn't get it," in which both regulations and regulators are seen as an inconvenience rather than a means of protecting the public. Moreover, as noted above, the evidence shows that Defendants lack the managerial resources and expertise to manage effectively the numerous water systems for which they are responsible, especially the smaller ones.

While Defendants argue that the near absence of alleged violations between late 1994 and 1998 shows that Tom Adcock's assumption of day-today management of the companies has improved greatly the companies' compliance with the law, the protracted boil orders at Vierra Canyon and Moss Landing happened on Tom Adcock's watch. The testimony as to those very recent events reflected many of the same patterns of denial, minimization, blaming others and simply no: getting things done that characterized the tenure of the senior Adcocks. Although it was impressed with Tom Adcock's sincerity and has no doubt that his subjective intent is to do the right thing, the Court concludes that under present circumstances Defendants lack both the managerial and financial wherewithal to operate in a manner which will ensure the protection of public health.

The Court has considered carefully and at length whether it should limit its grant of relief to an injunction requiring Defendants to implement some or all of the recommendations of the Black & Veatch report. While this option is tempting because it would be less drastic and less administratively cumbersome than a re-

ceivership, the evidence supports the conclusion that ultimately it would be ineffective. As noted earlier, Defendants clearly lack the financial resources to implement the Black & Veatch recommendations. There was no credible evidence that at any time in the near future they could borrow enough money to fund the recommended improvements or that they could count on regulatory approval of a rate increase to pay back lenders. The smaller water systems in particular suffer from basic, chronic, physical inadequacies, correction of which will require an immediate and significant infusion of funds.

The Court appreciates and respects the decades of hard work the Adcock family has devoted to its water companies. But the Court has the responsibility in this case of crafting a remedy that is protective of public health, and this responsibility necessarily takes preeminence over all other considerations. Although not binding on this Court, California's expressed public policy regarding small troubled water systems is relevant to the case before the Court. Section 855 of the Cal. Public Utilities Code expressly provides for the appointment of a receiver to run a water utility where the water utility is "unable or unwilling to adequately serve its ratepay-

ers." That clearly is the case here. The Court concludes that some form of receivership is necessary in this case to protect public health and to effectuate the purposes of the SDWA.[9]

At the close of trial, the Court raised *sua sponte* the possibility of a partial divestiture which would permit defendants to continue to operate Alco, their one midsized system, while being required to sell the others. The Court believes that there are a number of bases in the record for such a disposition. First, the most severe recent violations have occurred in smaller systems such as Vierra Canyon, Moss Landing and San Jerardo. By contrast, the Alco system has operated for the most part without incident since Tom Adcock assumed *de facto* management of the companies. Second, despite the fact that Alco serves many more customers than any of the other systems, the immediate capital improvements recommended by Black & Veatch with respect to Alco are relatively modest; in contrast, the cost of improving small systems such Normco, San Jerardo and Vierra Canyon in each instance is more than double that associated with Alco. *See* Pl. Exh. 207A.[10] Third, to the extent that deficiencies in management are

9. Also relevant is the testimony of defendants' PUC expert, Carl Danner, who testified that it is the current policy of the PUC to seek to facilitate the sale of small, troubled water systems to larger, more reputable water companies. Tr. at 1337–38; Pl. Exh. 219. That is because, as Mr. Danner testified, the California Legislature has found, as codified at Section 2719 of the Pub. Utility Code, that public water systems are faced with the need to replace or upgrade infrastructure to meet increasingly stringent safe drinking water laws; and because increasing amounts of capital are required to finance the necessary investment in public water system infrastructure; and because economies of scale are achievable in the operation of public water systems. Tr. at 1336–37; Pl. Exh. 218. As Mr Danner further testified, the PUC has recognized that

larger companies can bring more resources to bear in emergency situations; have greater management and operational expertise; and have greater access to funding for infrastructure needs than do small troubled systems. Tr. at 1331–33; Pl. Exh. 218.

10. The Court acknowledges, as the government points out, that Black & Veatch recommends additional capital improvements to the Alco system which could cost as much as $2.7 million. However, if Defendants prove that they are capable of managing this single system effectively, the prospects of their raising the necessary funds either through financing or rate increases within the time frames recommended by Black & Veatch would appear to be less speculative.

one of the sources of Defendants' continuing inability to meet their legal obligations, it is logical to conclude that managing one mid-sized water company will be easier than trying to manage a far-flung empire of small ones. Finally, such a remedy would be less drastic than the full divestiture requested by the government while at the same time having some realistic prospect of success in ensuring that the public receives safe drinking water.

The Order Appointing Equitable Receiver issued herewith provides for:

1. An injunction requiring Defendants to implement the recommendations of the Black & Veatch report with respect to Alco, forthwith as to those items designated by the United States' expert, Brian McKeown, as "immediate" needs and within the recommended time frames as to all remaining items; [11]

2. Appointment of a receiver, to be compensated by Defendants, to assume management of all of the water systems with the exception of Alco;

3. An order instructing the receiver to assess the feasibility of selling all of the water systems other than Alco either separately or in combination and to report the results of such assessment to the parties and to the Court;

4. An order instructing the receiver, either personally or with the assistance of a retained expert to be compensated by Defendants, to monitor Defendants' compliance with both the injunction and all applicable laws and regulations and to report the results of such monitoring to the parties and to the Court; and

5. An order reserving the Court's jurisdiction to enter such further orders as are appropriate in the event that some or all of the water systems other than Alco cannot be sold, considering *inter alia* defendants' compliance with the injunction and with their legal obligations generally.

The Court has given serious thought to the government's proposal that the Court order immediate divestiture of all of the water companies. It should be obvious from the foregoing discussion that the Court believes that Defendants' conduct as shown by the evidence fully justifies such a step. The Court nonetheless is constrained by the case law and by general principles of equity to explore the effectiveness of a less drastic remedy. The disposition outlined above addresses immediately the most dysfunctional elements of Defendants' operations, the small water systems, while giving Defendants a clear opportunity to demonstrate that they can operate at least one water system in compliance with the law. Should the disposition prove to be impracticable, either because the smaller systems cannot be sold unless they are "packaged" with Alco or because Defendants cannot or do not comply with the injunction or their legal obligations, the Court retains the ability to order full divestiture, and it will not hesitate to do so should circumstances warrant.

## ORDER APPOINTING EQUITABLE RECEIVER

Having conducted a bench trial in the above-entitled matter on December 4–7, 2001, December 18–20, 2001, and January

---

**11.** Defendants argue that PUC approval will be required for some or all of these improvements. As the government correctly notes in its motion to strike Defendants' objections, there is no evidence in the trial record which would enable the Court to assess this argument. Obviously, if regulatory requirements of the PUC or any other agency constrain Defendants' ability to comply with this Court's orders, the Court will take such requirements into account in overseeing Defendants' compliance.

7–8, 2002, to determine the appropriate relief in this case; having considered the pre-trial and post-trial briefs submitted by the parties as well as Plaintiff's proposed form of order and Defendants' objections thereto; in light of Defendants' lengthy history of failing to provide healthful drinking water in compliance with the Safe Drinking Water Act ("Act"), 42 U.S.C. § 300f et seq. and the clear potential for imminent violations of the Act by the Defendants in the future; because of the failure of less drastic remedies to secure Defendants' compliance with the Act in the past; in view of the broad range of equitable powers available to this Court to enforce and effectuate its orders and judgments; and good cause therefore appearing, the Court hereby ORDERS that a Receiver be appointed to assume management of the following drinking water systems owned and operated by Defendants (collectively, "The Water Systems"): Toro Water Service, Inc.; Moss Landing Water Service, Inc.; North Monterey County Water Service, Inc.; Blackie Road Water System # 18; San Jerardo Water System; Vierra Canyon Water System; Langley/Valle Pacifico Water System; and Buena Vista Water System. The Defendants shall maintain control of Alco Water Service ("Alco") which, for purposes of this Order, is not considered part of The Water Systems. The Receiver shall, however, have certain monitoring responsibilities with respect to Alco as described below.

The legal and factual basis for this Order is set forth with particularity in the Court's Findings of Fact and Conclusions of Law issued simultaneously herewith.

## I. *General Powers, Authorities and Duties of the Receiver*

A. Pending an investigation of the feasibility of selling The Water Systems, the Receiver shall have the following powers, authorities and duties with respect to management of The Water Systems, consistent with applicable laws and regulations, including any requirements of the California Public Utilities Commission (PUC):

1. To pay and collect bills; to incur debt; to hire necessary assistants, consultants, contractors, attorneys and engineering firms; to hire and fire personnel; and to acquire and repair capital equipment.

2. In his or her discretion, to perform all acts deemed necessary to achieve and maintain, as expeditiously as possible, full compliance with the Act and with all other applicable laws and regulations, including but not limited to the following: to sell and convey corporate property as necessary to manage The Water Systems; to impose lawful charges for water service upon customers of all The Water Systems and to collect such charges; to apply to the PUC for rate increases on a temporary and/or permanent basis, as appropriate; and to manage, control, convey, liquidate, and deal with all items, assets, properties, contracts, and other matters incident to his or her responsibilities. Nothing herein, however, authorizes the Receiver to sell any of The Water Systems without further Order of the Court.

3. To have full and complete access to the personnel, books, records, electronic databases and facilities of The Water Systems and to make such items available to any consultants, accountants, attorneys or other such persons employed by the receiver.

4. To consult with personnel of the United States Environmental Protection Agency with respect to any aspect of management, planning, and operation of The Water Systems, and to secure technical advice or assistance from such personnel for the purpose of assuring compliance with the Act and all other applicable laws and regulations.

B. The Receiver shall submit monthly operating reports to this Court and to the parties which reports shall contain all financial information for The Water Systems, including an accounting of any fees drawn by the Receiver, and all receipts, disbursements, debts and claims of the receivership over the reporting period; as well as all information related to the Receiver's efforts to bring The Water Systems into, and to maintain, compliance with the Act and all other applicable laws and regulations.

C. The Receiver shall promptly mail notice of the general terms of this receivership to all customers of The Water Systems.

In addition to discharging the foregoing duties with respect to The Water Systems, the Receiver, either personally or with the assistance of any retained consultants or experts, also shall monitor Alco's compliance with the requirements of this Order, as set forth below, and with all applicable laws and regulations. The Receiver shall submit monthly operating reports to this Court and to the parties setting forth the results of such monitoring.

The Receiver shall not be personally liable for any act done in compliance with this Order. The Court will defer the question of whether the Receiver should be required to furnish a bond pending a review of the qualifications of the Receiver.

All assets of The Water Systems shall be subject to the receivership. No person may file any action or enforce or create any lien, or cause to be issued, served, or levied any summons, subpoena, attachment, or writ of execution against the Receiver or any property subject to the receivership without first obtaining Court approval upon motion with notice to the Receiver and the Attorney General. Any legal procedure described herein commenced without prior Court approval is void except as to a bona fide purchaser for value and without notice to the receivership. No person without notice of the receivership shall incur any liability for commencing or maintaining any legal procedure described by this paragraph.

Within three (3) weeks of his or her appointment, the Receiver shall report to the Court and to the parties whether in the Receiver's judgment the receivership as established by this Order is practicable or whether, given the interrelationship between The Water Systems and Alco, or for any other reason, the receivership as established by this Order is ineffectual and/or in need of revision. To the extent the Receiver concludes that the receivership impracticable, either wholly or in part, the Receiver's report to the Court and to the parties shall set forth the reasons for this conclusion and suggest amendments to this Order addressing the Receiver's concerns.

II. *Specific Powers, Authorities and Duties of the Receiver in Assessing the Feasibility of Selling The Water Systems*

The Receiver shall immediately assess the feasibility of selling The Water Systems and shall have the additional specific powers, authorities and duties in doing so:

A. To determine whether The Water Systems, either separately or in combination, realistically can be sold to a water purveyor with: (1) a demonstrated history of compliance with the Act; and (2) sufficient financial resources to implement the capital improvements and other measures recommended by the engineering firm Black & Veatch in that firm's October, 2001, reports on The Water Systems, a copy of which will be made available to and kept in the possession of the Receiver.

B. To hire any attorneys, or other agents, as reasonably are necessary in the

Receiver's judgment to assist in assessing the feasibility of effecting a sale of The Water Systems, either separately or in combination.

C. To make public, by usual and customary means, the potential availability of The Water Systems for purchase. The Receiver shall inform any person making an inquiry regarding a possible purchase of The Water Systems that the assessment of the feasibility of such a sale is being conducted pursuant to this Order and provide that person with a copy of this Order. The Receiver also shall offer to furnish to all prospective buyers, subject to customary assurances of confidentiality and any applicable laws or regulations, all information and documents relating to The Water Systems customarily provided in a due diligence process except for information or documents that are subject to the attorney-client or work-product privileges. The Receiver shall make available such information to the United States at the same time that such information is made available to any other person.

D. To permit prospective buyers to make inspections of the physical facilities of The Water Systems and to have reasonable access to personnel: to any and all environmental, zoning, and other permit documents and information; and to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E. Not later than sixty (60) days after his or her appointment, the Receiver shall file with the Court and the parties a report setting forth the Receiver's findings with respect to the feasibility of accomplishing a sale as required by this Order. To the extent that such report contains information that the Receiver deems confidential, such report shall not be filed in the public docket of the Court. Such report shall include the name, address, and telephone number of each person who expressed an interest in acquiring The Water Systems and shall describe in detail each contact with each such person.

### III. *Requirements Applicable to Alco*

Alco is ordered to comply, and the Receiver shall monitor Alco's compliance, with the following provisions, subject to all applicable laws and regulations, including any requirements of the PUC:

A. Alco shall implement forthwith those items from the Black & Veatch report designated by the government's expert, Brian McKeown, as "immediate" needs and within ninety (90) days shall present to the Receiver a plan for implementation of the remaining items within the time frames recommended by Black & Veatch.

B. Alco is enjoined from making any distributions to shareholders while this Order remains in effect. Alco is further enjoined from making any extraordinary expenditures while this Order remains in effect, including the repayment of debt to shareholders.

### IV. *Requirements Applicable to the Adcocks*

A. Robert T. Adcock, Natholyn P. Adcock, Thomas R. Adcock and Lynette Adcock (collectively, "The Adcocks") shall provide the Receiver with access to all records of account, including names, addresses, and amounts owed for water service, records or payment history, and record cards of each customer of each of The Water Systems. The Adcocks further shall provide the Receiver with access to all cash or cash-type assets on hand, all keys, instruments of title, records and pass books of bank accounts, all supplies, all monitoring equipment, and all other equipment or other items employed in the operation of The Water Systems, including tools and motor vehicles.

B. The Adcocks shall use their best efforts to assist the Receiver in the performance of his or her duties. The Adcocks are hereby enjoined, restrained and prohibited from interfering in any way with the Receiver in the discharge of his duties.

C. The Receiver shall have discretion to determine whether and to what extent the Adcocks are involved in the day-to-day operation of The Water Systems.

D. The Adcocks shall cooperate with and assist the Receiver to the extent necessary and appropriate to permit the Receiver to carry out his or her responsibilities under this Order.

E. The Adcocks shall not acquire any new interest, financial or otherwise, in any "public water system" as that term is defined under the Act, 42 U.S.C. § 300f(4), without the express permission of this Court.

## V.  *Compensation*

Defendants shall be responsible for compensation of the Receiver and of any and all persons employed by the Receiver in carrying out the provisions of this Order. The amount of compensation shall be fixed by the Court upon written application by the Receiver with notice to the parties. In determining any request for allocation of responsibility for the Receiver's compensation among the several Defendants, the Court will consider *inter alia* any applicable laws or regulations, including any requirements of the PUC.

## VI.  *Retention of Jurisdiction*

A. This Court retains jurisdiction to enter such further orders as are appropriate in the event that some or all of The Water Systems cannot be sold and as necessary to effectuate the purposes of the Receivership.

B. This Court retains jurisdiction to enable any party subject to this Order to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Order, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## VII.  *Expiration of Order*

This Order shall expire upon the termination of the Receivership created hereunder, or two years from the date of this Order, whichever is sooner, unless the Order is extended by the Court.